IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


HARVEY STEVENS,                          )
            Plaintiff,                   )
                                         )
v.                                       )          No. 3:06-CV-40
                                         )          (Phillips)
LOCKHEED MARTIN ENERGY SYSTEMS, INC.,    )
and BWXT Y-12, L.L.C.,                   )
            Defendants.                  )


## MEMORANDUM OPINION

Plaintiff Harvey Stevens has sued his former employers, Lockheed Martin
Energy Systems, Inc. and BWXT Y-12, L.L.C. (BWXT), alleging racial discrimination in
employment by being denied several promotions and a training opportunity in violation of
42 U.S.C. § 2000e, *et seq.,* (Title VII) and 42 U.S.C. § 1981 as amended. Defendant
BWXT has moved for summary judgment asserting that there are no genuine issues as to
material facts, and that BWXT is entitled to judgment as a matter of law on all of plaintiff's
claims. For the reasons which follow, defendant's motion for summary judgment will be
granted, and this action will be dismissed against BWXT.


## Factual Background

Beginning April 1, 1984, pursuant to a contract with the Department of
Energy, LMES managed, operated and maintained the Y-12 facility in Oak Ridge,
Tennessee. LMES' contract for operating the Y-12 facility ended on October 31, 2000, and

BWXT assumed management and operation on November 1, 2000. Stevens, an African-American male, was employed by LMES and the predecessor government contractors at Y-12 from July, 1965 until October 31, 2000. Stevens has been employed by BWXT from November 1, 2000 to the present.

Stevens is an hourly employee, and has worked as a machine operator at Y-12 since 1969. He is a member of the International Machinist and Aerospace Workers' Local 480, and the terms of his employment are governed by a contract between BWXT and the Atomic Trades and Labor Council. Stevens served as the chief steward in the union's leadership from 1985 to 1990. During that time, he had 65 to 72 stewards that worked for him. He represented approximately 1400 people and handled all of their grievances and complaints. He served two and a half terms, having been elected to two terms as chief steward.

Stevens started the Veterans Day program at Y-12, and served as Chairman or Co-Chairman of the program for approximately eighteen years. Stevens also implemented the Y-12 paper and aluminum can recycling project. He was selected as one of the 1992 Martin Marietta Energy Systems award recipients for his efforts. In 1994 he received the Y-12 Award for Excellence for his work on the recycling project.

Internal applicants for supervisor positions at BWXT are placed in one of two categories: salaried employees are "eligible"; hourly employees are "ineligible." "Ineligible"

applicants are not considered for a supervisor position until the list of qualified "eligible" applicants is exhausted. Stevens alleges that BWXT denied him three promotions for discriminatory reasons: (1) Supervisor of Machining in September 2001; (2) Supervisor of Machining in February 2002; and (3) General Supervisor of Machining in March 2002.

The September 2001 Supervising of Machining Position

BWXT posted the first Supervisor of Machining position on September 4, 2001 (Posting 410). Posting 410's education and experience section stated:

> High school diploma and a minimum of two years experience in a machine area are required. Must possess ability and interpersonal skills to work closely, and often simultaneously, with a variety of disciplines. Computer skills relevant to systems used throughout the Y-12 Plant are required. Position requires dedication and commitment to all safety disciplines. Strong written and oral skills are required. Impromptu written skills evaluation may be included as part of the selection process.

The special knowledge and/or training section provided:

> Requires knowledge and experience in machine methods, techniques, tools, and setups; requires a general knowledge of other crafts.
>
> Requires basic understanding of handling procedures for accountable and nuclear materials.
>
> Requires knowledge of regulations governing the packing and shipping of radioactive and hazardous materials.
>
> Enriched uranium processing experience within a MAA and knowledge of comprehensive criticality safety and radiological control requirements are desirable.
>
> Prior supervisory experience or work experience in a related area is desirable.

-3-

Vince Brown was the hiring supervisor for Posting 410, and he reported to Terry Shope, the Operations Manager. Brown and Wayne Gibson, both General Supervisors, interviewed candidates for the position. The "eligible" salaried applicants were James McNabb Jr., Lisa Shultz, and Sandra Price. However, none of the eligible applicants were qualified because they did not possess relevant machining experience.

The "ineligible" hourly applicants were Thomas Finch, Thomas Harvey, Michael Henley, Curtis Jones, and Leonard Ellison. BWXT's staffing office never received an application from Stevens, and had no notice during the interview process that Stevens had attempted to apply. Neither Finch nor Harvey were interviewed because they lacked relevant skills, aptitude, or machining experience. Henley, Jones and Ellison were interviewed on October 15, 2001 and were asked identical questions. Based upon the individual interviews, the qualifications of each applicant, and the established criteria for the position, Brown and Gibson agreed that Michael Henley was the most qualified candidate.

Brown and Gibson chose Henley because he had over fifteen years of machining experience, and was currently working with enriched uranium in the same Material Access Area (MAA)[1] where he would be working as Supervisor of Machining. This particular MAA is known as the "M-Wing." Because nuclear material is located in M-Wing,

---

[1] MAA areas are the most restricted and secure areas at Y-12 because special nuclear material is processed there.

employees who work in that area are required to have highly specialized "fissile" training. This includes "criticality safety" training on how to properly handle nuclear components, as well as training on radiological control requirements. M-Wing employees must also be certified under the Personal Security Assurance Program (PSAP). PSAP certification involves a comprehensive background check which can take nine months to complete. Henley was PSAP certified when he applied for Posting 410. Additionally, Henley was currently working as a machinist in M-Wing and had hands-on knowledge of the comprehensive criticality safety and radiological control requirements that were required to work with nuclear materials.

Before a final decision was made, Shope sought input from Erby Harris, an African-American Machining Supervisor in M-Wing. Harris stated that Henley was his first choice because Henley was currently working in M-Wing and was PSAP certified. Brown, Gibson, Harris and Shope agreed that Henley was the most qualified candidate. Brown offered Henley the job, which he accepted.

After the position was awarded to Henley, plaintiff Stevens asked Brown why he had not been interviewed for the opening. Brown said that he had not received a copy of Stevens' application. According to Stevens, he had asked Bobby LeMarr, a union steward, to submit an online application on Stevens' behalf. Stevens himself was computer illiterate. Brown called BWXT's staffing office, and learned that it had never received a copy of Stevens' application.

-5-

Shortly after Henley was awarded the Supervisor of Machining position, Shope offered Jim Littleton a similar position in M-Wing. Littleton was an Environmental Compliance Officer in M-Wing whose job was being eliminated in a reorganization. Shope determined that Littleton was qualified for the second Supervisor of Machining position, and offered him the job because he did not want to lose an accomplished supervisor. Because Littleton's selection occurred as a result of a reorganization, the formal application process was not used. Rather, Littleton transferred from Environmental Compliance Officer in M-Wing to Supervisor of Machining.

At the time of the transfer, Littleton had worked at Y-12 for over thirty years, and had been Supervisor of Machining from 1984 to 1997. From 1997 until 2000, Littleton had been an Assistant General Supervisor of Machining in M-Wing, which is one level above a Supervisor of Machining position. He began working in the Environmental Compliance Department in 2000, and was an Environmental Compliance Officer in M-Wing when his position was eliminated in 2001.

The February 2002 Supervisor of Machining Position

BWXT posted a second Supervisor of Machining position (Posting 689) on February 27, 2002. As with the Supervisor of Machining positions that Henley and Littleton received, Posting 689 was located in M-Wing. The education, experience, training, and special knowledge requirements for Posting 689 were identical to the requirements for the positions awarded to Henley and Littleton.

-6-

Stevens submitted an application for Posting 689, and was considered an "ineligible" hourly applicant. Vince Brown and Erby Harris were initially responsible for selecting the individual to fill Posting 689. BWXT received applications from three "eligible" candidates – William Cate, Kimberly Bryant and Larry Kauffman. Because Bryant did not possess the requisite machining experience, she was not interviewed for the position. Both Cate and Kauffman were interviewed by Brown and Harris. Brown and Harris agreed that Cate, a Utility Supervisor, was the most qualified candidate. Cate had been a machinist at Y-12 for over thirteen years, had previously worked in M-Wing, and had been PSAP certified. Cate was therefore offered the job, but declined the position. Kauffman, while an eligible candidate, was not offered the job because he lacked the leadership, verbal, and interpersonal skills necessary for the position.

Because the opening could not be filled from the pool of "eligible" applicants, BWXT next considered "ineligible" hourly applicants. Harris' participation in the selection process concluded at this juncture due to a promotion. BWXT considered applications from four "ineligible" hourly candidates – Stevens, Paul Sherrod, Thomas Harvey, and Sherry Barrow. Barrow subsequently withdrew her name and was not given further consideration. Brown did not select Harvey or Stevens for an interview because neither met the minimum qualifications for the position. Brown felt that Harvey (Caucasian) did not possess the requisite machining experience. Having worked with Stevens for approximately twenty years, Brown was familiar with Stevens' performance, capabilities, and leadership abilities. Brown was also aware that Stevens did not have fissile experience in an MAA, which was

required for the job. Brown also felt that Stevens lacked the leadership and management skills required for the position. Thus, Brown determined that Stevens failed to meet the established job criteria, and did not schedule Stevens for an interview.

Brown knew that Sherrod had worked in M-Wing as a machinist for over ten years, and therefore had fissile experience. Brown interviewed Sherrod for the position and selected him to fill Posting 689. Brown felt that Sherrod was the most qualified candidate for the position because of his ten years' experience in an MAA, his knowledge of criticality safety issues, and his performance history.

The April 2002 Supervisor of Machining Position

BWXT posted a third Supervisor of Machining position in the enriched uranium area (Posting 767) on April 17, 2002. The education, experience, training and special knowledge requirements for Posting 767 were the same as the requirements for the previous positions. Vince Brown and Terry Shope selected Terry Carmack to fill Posting 767 in June 2002. Carmack had been a machinist at Y-12 for over ten years and had worked in MAAs which provided him with experience in criticality safety and radiological control requirements. Carmack had also completed PSAP training in 1992. Stevens never applied for Posting 767 and was not considered for the position.

<u>The March 2002 General Supervisor of Machining Position</u>

BWXT posted a General Supervisor of Machining position on March 8, 2002 (Posting 709). The General Supervisor of Machining position is one step above the Supervisor of Machining job. The normal progression for this position is craft worker, planning estimator, supervisor, and then General Supervisor. The education and experience requirements for Posting 709 stated:

> Requires ten years of related metal fabrication and welding operations: Requires knowledge of metal fabrication techniques, tooling, welding, and plant operations. Also requires good communication skills.

The position's responsibilities included:

> Supervising normally three or more machining, metal fab, or welding supervisors who are responsible for the supervision of 20 to 40 craft hourly employees.

Mike Allen was the hiring manager for Posting 709, and he and Wayne Gibson conducted the selection process. After interested individuals submitted applications to BWXT's staffing office, thirteen "eligible" and three hourly "ineligible" candidates were forwarded to Allen and Gibson. Allen and Gibson conducted interviews with the three eligible applicants who satisfied the minimum job requirements for the position: Rick Craze, Ernest Roberts, and Olin Brewer. The remaining eligible candidates were not interviewed because they lacked relevant skills. Allen and Gibson selected Rick Craze for the position. Because Stevens was an "ineligible" hourly applicant, and the position was awarded to a qualified "eligible" applicant, Stevens was not considered for the position.

-9-

Allen and Gibson determined that Craze possessed the most comprehensive experience for the position. From October 1979 through March, 2002, Craze worked in a variety of positions, including as a sheet metal worker, planner/estimator, fabrication supervisor, Machine Tool Specialist II, and project controls analyst. In several of these positions, Craze obtained metal fabrication and welding experience, which was important because the job oversaw the metal fabrication and welding department. Craze had also supervised employees for other thirteen years at Y-12 and had acted as the interim supervisor for Posting 709 following the death of A. Barnes. Craze also had planning and integration experience. Craze had a four-year business degree which Allen and Gibson felt would assist him in performing the budgetary aspects of the job. Stevens had none of these qualifications.

Stevens' Training Claim

Stevens also alleges that he was discriminated against by being denied a training opportunity. He asked his direct supervisor, G.P. Harper, and his General Supervisor, T.R. Vincent, for an opportunity to train on a numerical control machine that had recently been upgraded. The numerical control machine was operated by computer, using advanced technology. Harper selected more proficient employees to train on the numerical control machine. The persons who use the machine receive the same compensation as other machinists, including Stevens.

-10-

<u>Stevens EEOC Charge</u>

On May 8, 2001, Stevens filed a charge of discrimination with the EEOC. The EEOC charge alleges only that BWXT denied Stevens retirement benefits because of his age. It does not mention racial harassment, racial discrimination, or the denial of promotions or training. Stevens did not file an EEOC charge against BWXT complaining about any of the alleged unlawful conduct that forms the basis for his instant complaint.

BWXT has moved for summary judgment asserting that Stevens' promotion claims should be dismissed because he did not meet the minimum qualifications for any of the positions; his training claim should be dismissed because more proficient employees were chosen for the training and because the denial of training did not adversely affect his compensation or any other condition of his employment; and his Title VII claim should be dismissed because he failed to file a charge with the Equal Employment Opportunity Commission (EEOC) alleging race discrimination.

Plaintiff Harvey Stevens has responded in opposition, stating that the evidence in this case demonstrates that he was denied promotions and training based upon his race, thus precluding summary judgment in favor of BWXT.

## **Summary Judgment Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).


## Analysis

The order, allocation, and standard of proof in Title VII and § 1981 cases is governed by the three-part analysis set forth in *McDonnell Douglas Corp. V. Green,* 411 U.S. 792 (1973); *Texas Dept. Of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981); and *St. Mary's Honor Ctr v. Hicks,* 509 U.S. 502 (1993). *See also, Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (the same substantive analysis applies to Tile VII and § 1981 claims). Under this analytical framework, the plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination. *Burdine,* 450 U.S. at 252-53. If the plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to

-12-

articulate a legitimate, nondiscriminatory reason for the contested action. *Id.* Once the defendant satisfies this burden, the burden shifts back to the plaintiff to show that defendant's proffered reason is really a pretext for discrimination. *Id.* at 254-55. The plaintiff at all times bears the ultimate burden of persuasion that the employer's conduct was the product of intentional race discrimination. *Hicks,* 509 U.S. at 510-12.

In order to establish a *prima facie* claim of discrimination based on a failure to promote, Stevens must demonstrate: (1) he is a member of a protected class; (2) there was a vacant position for which he timely applied; (3) he was qualified for the position; and (4) a similarly-situated person who was not a member of the protected class received the promotion. *See Anthony v. BTR Auto. Sealing Sys., Inc.,* 339 F.3d 506, 515 (6th Cir. 2003). BWXT asserts that Stevens cannot make out a *prima facie* case for any of his promotion claims, nor can he show that BWXT's reasons for its employment decisions were pretextual.

The September 2001 Supervising of Machining Position

In his response to BWXT's motion for summary judgment, Stevens abandons his claim concerning the position that Michael Henley was awarded. Accordingly, summary judgment will be granted to BWXT on this claim.

-13-

<u>The February 2002 Supervisor of Machining Position</u>

This position was located in a MAA of the Y-12 plant known as the M-Wing. Because nuclear material is located in M-Wing, the job posting required candidates to have "fissile" experience. Fissile experience is defined, in part, has having a basic understanding of handling procedures for accountable and nuclear material and a knowledge of regulations governing the packing and shipping of radioactive and hazardous materials. The successful candidate, Paul Sherrod, had worked in M-Wing as a machinist for over ten years and had substantial fissile experience.

Stevens contends that he possessed the preferred qualifications set forth in the job posting: enriched uranium processing experience within an MAA; knowledge of comprehensive criticality safety and radiological control requirements; and prior supervisor experience or work experience in a related area. Specifically, Stevens claims that he worked in an undisclosed area of the plant for six months before it was designated as an MAA. Stevens also contends that he took some courses in criticality before 1985. In his declaration, Stevens stated that he acquired the requisite fissile experience "from both the training I have received, and my on-the-job experience of over thirty years." Even if true, Stevens did not possess the preferred qualifications because he was never assigned to an MAA and had no on-the-job knowledge of criticality requirements.

In addition, Stevens did not list his alleged fissile experience on the job application he submitted for Posting 689. Stevens further argues that he was never

-14-

interviewed and therefore the assessment of his qualifications was inaccurate and could not be relied on as a legitimate reason for selecting Sherrod for the position. It is not the hiring managers' responsibility to discern all of the plaintiff's work experience from the brief descriptions on his application. *See Seay v. Tennessee Valley Authority,* 339 F.3d 454, 464 (6th Cir. 2003). Moreover, Vince Brown, the hiring supervisor, testified that he had supervised Stevens for over twenty years, and he knew that Stevens had no fissile experience during that time period.

Next, Stevens argues that his tenure as chief union steward should serve as a substitute for supervisory experience. However, Brown testified that he did not think that Stevens had the management skills required for a supervisory position. *See McCormack v. Frank,* 1994 WL 419589 (6th Cir. Aug. 10, 1994) (affirming summary judgment where plaintiff's non-selection for promotion was based on supervisor's personal perception of plaintiff's management skills).

Because Stevens did not meet the minimum criteria for this position, and the record reflects that Sherrod was more qualified, Stevens *prima facie* case fails and summary judgment will be granted to BWXT.

The April 2002 Supervisor of Machining Position

In his response, Stevens alleges that it was not the position awarded to Michael Henley for which he submitted an on-line application, but instead the position filled

-15-

by Terry Carmack. Stevens and Bobby LeMarr testified that Stevens applied for the position on-line. However, it is undisputed that BWXT never received his on-line application. Stevens does not contend that any BWXT manager ever received his application. He claims only that LeMarr, a union steward, tried to submit his application electronically on the computer. Stevens is computer illiterate and has presented no evidence that BWXT actually received the application. Thus, Stevens fails to establish the second prong of a *prima facie* case for this position. *See Nguyen v. City of Cleveland*, 299 F.3d 559, 563-64 (6th Cir. 2000) (summary judgment appropriate because plaintiff did not establish that he applied for the position).

Assuming, *arguendo,* that Stevens had submitted an application for Posting 767, he cannot show that he is similarly-situated to the successful candidate, Terry Carmack. Carmack had been a machinist at Y-12 for over ten years and had worked in MAAs which provided him with experience in criticality safety and radiological control requirements. Carmack had also completed PSAP training in 1992, which Stevens did not have. Although Stevens stated that he had taken a variety of radiation courses, he had no on-the-job training similar to Carmack. As a result, Stevens was not similarly-situated; thus, he has failed to establish a *prima facie* case. *See Anthony v. BTR Auto Sealing Sys., Inc.,* 339 F.3d 506, 516 (6th Cir. 2003) (affirming summary judgment because the candidates selected for promotion possessed the required and preferred job qualifications while plaintiff did not; plaintiff's mere assertion that he was more qualified was insufficient to avoid summary judgment).

The March 2002 General Supervisor of Machining Position

        In his response to BWXT's motion for summary judgment, Stevens acknowledges that under the company policy of looking first at monthly employees before considering hourly employees, he would not be reached and promoting Rick Craze was not discriminatory. Accordingly, BWXT is entitled to summary judgment on this claim.

Stevens' Training Claim

        To make out a *prima facie* case of disparate treatment as to his failure to train claim, Stevens must establish that (1) he was subjected to an adverse employment action, and (2) similarly situated white employees were treated better. *See Smith v. City of Salem,* 378 F.3d 566, 570 (6th Cir. 2004). BWXT asserts that Stevens cannot establish a *prima facie* case because BWXT's failure to train Stevens on the numerical control machine does not constitute an adverse employment action.

        An "adverse employment action" is a "materially adverse change in the terms or conditions of employment." *Policastro v. Northwest Airlines*, 297 F.3d 535, 539 (6th Cir. 2002). A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation. *Ford v. GMC,* 305 F.3d 545, 553 (6th Cir. 2002). A change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Kocsis v. Multi-Care Mgmt, Inc.,* 97 F.3d 876, 886 (6th Cir. 1996). *De minimis* employment actions

are not materially adverse and, thus, not actionable. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 461 (6th Cir. 2000).

Stevens' allegation that he was not trained on the numerical control machine does not meet the standard for an adverse employment action of a "materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 461 (6th Cir. 2000); *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir. 1999). The record shows that BWXT employees who use the numerical control machine receive the same compensation as other machinists, including Stevens. The alleged denial of training is therefore not an adverse employment action as a matter of law, and BWXT is entitled to summary judgment on Stevens' failure to train claim. *See e.g., Johnson v. United Parcel Service,* 2004 WL 3008776 (6th Cir. Dec. 21, 2004) (affirming summary judgment on plaintiff's denial of training claim because there was no adverse employment action, nor was there evidence that similarly-situated white employees were selected for training on the basis of race).

Stevens Title VII Claims

In his response to BWXT's motion for summary judgment, Stevens abandons his claims brought under Title VII. Thus, BWXT is entitled to summary judgment on Stevens' Title VII claims.

-18-

**<u>Conclusion</u>**

For the reasons stated above, the court finds that defendant BWXT is entitled to judgment as a matter of law on Stevens' claims of discrimination under Title VII and 42 U.S.C. § 1981. Accordingly, defendant's motion for summary judgment [Doc. 8] will be granted, and this action will be dismissed against BWXT Y-12, L.L.C.

**ENTER:**

     s/ Thomas W. Phillips
United States District Judge